**Daniel MOLERIO, Appellant**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al.**

No. 83–2095.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1984.

Decided Nov. 30, 1984.

---

818

Arthur B. Spitzer, Washington, D.C., with whom Andrew B. Weissman and Margaret L. Tobey, Washington, D.C., were on the brief, for appellant.

Freddi Lipstein, Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Barbara L. Herwig, Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before EDWARDS, SCALIA and FRIEDMAN,* Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

We review the decision of the District Court to dismiss an action brought by Daniel Molerio, who asserted that the Federal Bureau of Investigation refused to hire him as a special agent for reasons which were both illegal and unconstitutional. The appeal raises issues, among others, of the validity and effect of the government's assertion of the state secrets privilege, and of the elements necessary to sustain claims under Title VII of the Civil Rights Act and the Due Process Clause of the Constitution.

I

On September 19, 1979, Daniel Molerio applied to be an FBI special agent. At the

* United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

time, he was a criminal investigator in the Immigration and Naturalization Service, where he held a "secret" security clearance. A panel of three FBI special agents interviewed Molerio, and rated him an "outstanding candidate." After an interview and examinations, Molerio ranked fifth out of the 785 applicants in the Special Agent Selection System, and was included in a list of agents tentatively selected for the new class of special agents, subject to a background investigation for the necessary "top secret" security clearance.

Because, as he was told, the investigation had revealed "something in New York having to do with his family," Complaint ¶ 14, Molerio was interviewed a second time. This interview concentrated on his family relationships and the political beliefs of members of his family. Molerio was asked about pro- and anti-Castro groups, specifically the "26th of July" group, a Cuban political organization which supported the Castro revolution and to which Molerio's father belonged at one time. Molerio was later told that his application had been referred to the Bureau's counter-intelligence division because "his background investigation [revealed] something in New York having to do with [his] father," Complaint ¶ 27. In a letter dated November 20, 1980, the Bureau informed him that he would not be hired. No reasons were given.

After contacting EEO officers in the Immigration and Naturalization Service and the FBI, Molerio filed a formal complaint of discrimination, which was denied. He also filed combined Freedom of Information Act ("FOIA") and Privacy Act requests with FBI headquarters and several Field Offices. The agency began processing these requests, and acknowledged that responsive documents were located; no documents, however, have been provided.

Molerio then brought this action for injunctive relief and damages, naming as defendants the Bureau, its Director, and the individual who was its Personnel Officer during the period at issue. Molerio sought relief on four counts. First, he claimed that the Bureau's actions violated Title VII, 42 U.S.C. § 2000e–16 (1982). He alleged that he was qualified for the job of special agent, but was not chosen because of his Cuban or Hispanic national origin. Second, he alleged that the Bureau decided not to hire him because of his association with his father and his father's political activity, in violation of his First Amendment associational rights. Third, he asserted that he had been deprived of his liberty without due process of law, stating that the action of the Bureau had impugned his reputation and adversely affected his chance for advancement within the government, all without adequate procedural protection. Finally, he claimed that the Bureau wrongfully denied his FOIA and Privacy Act requests, 5 U.S.C. §§ 552(a) & 552a(d) (1982), and, in violation of the Privacy Act, willfully maintained inaccurate records regarding him as a result of which he was harmed, 5 U.S.C. § 552a(g).

Defendants answered the complaint, and complied with discovery requests, although redacting many of the documents produced to eliminate information which would "jeopardize or interfere with National-States Secrets or the National Security." Molerio moved to compel production of the redacted portion of selected documents. Defendants moved to stay consideration of this motion on the ground that they would soon move to dismiss the action—which they did, claiming that the state secrets privilege required dismissal. The Bureau also submitted an affidavit, to be examined in camera, disclosing the Bureau's reasons for not hiring Molerio. Defendants argued that because either the prosecution of the case or its defense would require disclosing state secrets, the action must be dismissed.

The District Court held that the Department of Justice had complied with the formal requirements of the state secrets privilege, and that the reason for Molerio's non-appointment revealed in camera was protected by the privilege. The court held first, that without the privileged information the plaintiff had not made out a prima facie case; and second, that even if he had

the suit would have to be dismissed because the defendants were unable to present their defense on the record. The court was unwilling to require the government to present the secret material in camera, since that would compromise the court's objectivity by forcing it to evaluate evidence without the assistance of opposing counsel. The court dismissed the plaintiff's action "for failure to state a claim upon which relief can be granted," and the motion to compel production as moot. *Molerio v. FBI,* Civil No. 83–1706, mem. op. at 11 (D.D.C. Sept. 6, 1983) ("mem. op.").

## II

■ Since all of the rulings challenged here, including that as to the insufficiency of the evidence, constitute findings of law rather than fact, in our consideration of this appeal we do not defer to the judgment of the district court and reverse only if that judgment is clearly erroneous, but rather make our own independent assessment. *Western Casualty & Surety Co. v. National Union Fire Insurance Co.,* 677 F.2d 789, 791 n. 1 (10th Cir.1982). A preliminary issue relates to the evidence that we can properly take into account.

■ Molerio claims that since what was before the District Court was the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it was improper for the district judge, and it would be improper for us upon this appeal, to consider evidence outside the pleading. We disagree. Although the defendants styled their motion as one brought under Rule 12(b)(6), no one treated it as such. The appellant, in fact, treated it as a motion for summary judgment. He filed a "Statement of Genuine Issues," which the District Court's Local Rule 1–9(i) requires parties to file in connection with summary judgment motions. That document specifically acknowledged that "[b]y disputing the plaintiff's factual allegations on the basis of matters outside the pleadings, the defendants have converted their motion to dismiss to a motion for summary judgment." J.A. 96. While the conclusion of

the court's memorandum opinion asserted that the appellant had not stated a claim upon which relief could be granted, mem. op. at 11, it is apparent from the text of the opinion that the primary basis for dismissal was that he had not made out a prima facie case in support of any of his claims, *id.* at 7 (Title VII claim) & 8 (First Amendment, due process, FOIA, and Privacy Act claims). It is true that, if the District Court was proceeding in this fashion, it should more properly have denied the motion to compel production of documents rather than dismiss it as moot. The latter course is more consistent with the District Court's alternative theory (*viz.,* that the litigation could not proceed because the defendants would be unable to present their defense) which would, if valid, perhaps produce dismissal for failure to state a claim. But we can of course affirm the District Court on any valid ground, and need not follow the same mode of analysis. *Langnes v. Green,* 282 U.S. 531, 538–39, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931). Without passing upon the validity of a more direct approach to dismissing the entire suit, we choose to rely upon the primary theory reflected in the District Court's opinion, for which purpose we find no difficulty in treating the defendants' motion, as appellant himself treated it, as a motion for summary judgment.

■ Molerio's next procedural point is that it is improper to treat a 12(b)(6) motion accompanied by matters outside the pleading as a Rule 56 motion for summary judgment unless all parties have been given a reasonable opportunity to submit material appropriate to the latter motion. FED.R. CIV.P. 12(b). He asserts that this opportunity was not provided, since the District Court wrongfully denied (in effect) his motion to compel production by accepting the government's assertion of the state secrets privilege, *i.e.,* the privilege against disclosure of information that would adversely affect national security. As we have recently noted, this includes information that would result in "impairment of the nation's defense capabilities, disclosure of intelli-

gence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C.Cir. 1983) (footnotes omitted). When properly invoked to protect such interests, "the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure...." *Id.*

■ The leading case describes the procedural requirements for assertion of the privilege as follows:

The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.

*United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953) (footnotes omitted). These formal requirements were met in the present case. In an affidavit executed on April 4, 1983, and filed the next day, Acting Attorney General Schmults, who was during Attorney General Smith's absence from the country head of the Department of Justice (of which the Bureau is a component), formally invoked the privilege, specifically reciting that he had reviewed the pertinent portions of the plaintiff's applicant file and was familiar with the allegations of the complaint. Appellant objects that the affidavit did not recite personal review of the other files for which disclosure was sought, in particular the file on Molerio's father. The assertion of privilege, however, did not relate to particular documents, but to *all* documents and testimony that would disclose the reason for rejection of Molerio's application. To determine that reason, it would only be necessary to examine specifically Molerio's applicant file; and such examination (plus, of course, assessment of the national security consequences of disclosure) would constitute the "personal consideration" of the matter required by *Reynolds.* If the state secret were only an incidental part of the litigation, it might have been necessary for the Attorney General (either personally or by proper delegation) to go further, and to examine each document requested in order to determine that the state secret was implicated. But where, as here, the whole object of the suit and of the discovery is to establish a fact that is a state secret,[1] we are of the view that it suffices for the cabinet secretary to determine on personal consideration that disclosure of that fact would impair national security, whereupon compliance with the discovery request is excused in gross, without the necessity of examining individual documents. To the extent those documents would assist in establishing what is sought, they would be privileged, and to the extent they would not they would be immaterial and not a proper subject of disclosure. *See* FED.R.CIV.P. 26(b)(1); *O'Neal v. Riceland Foods,* 684 F.2d 577, 581 (8th Cir.1982). Insofar as the formal requirements are concerned, therefore, the assertion of the privilege here was adequate.

■ Satisfaction of the formal requirements, however, is not an end of the mat-

---

1. Appellant's Statement of Points and Authorities in Support of Motion to Compel Production of Documents at 6–13 explained why he needed the documents. Virtually all of them were sought to establish the reason for his nonappointment. Some were sought to establish that the Bureau maintained inaccurate records, in order to support the claim for damages under the Privacy Act; but that claim ultimately depended upon establishing the reason for Molerio's nonappointment as well. *See* page 826, *infra.* Whether or not that alone would be enough to render a blanket assertion of the privilege appropriate, any unjustified failure to produce relating to the Privacy Act claim was harmless, since the claim is invalid on the merits for reasons that cannot be affected by any inaccuracy in the Bureau's records except an inaccuracy pertaining to the state secret itself. *Id.* Of course even though the plaintiff did not seek correction of records, as the Privacy Act permits, 5 U.S.C. § 552a(g)(2)(A), if this case had proceeded and if such relief were shown to be warranted, the court would have had to award such relief in its final judgment, FED.R. CIV.P. 54(c); but it is at least permissible, if not mandatory, to evaluate requests for discovery on the basis of the relief sought rather than all relief to which the plaintiff may prove to be entitled.

ter. To some degree at least, the validity of the government's assertion must be judicially assessed. "[T]he court must be satisfied from all the evidence and circumstances, and 'from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'" *United States v. Reynolds*, 345 U.S. at 9, 73 S.Ct. at 532–33, *quoting from Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–19, 95 L.Ed. 1118 (1951). "[H]ow far the court should probe" in conducting this inquiry depends upon "the showing of necessity" for the information on the part of the party requesting it. 345 U.S. at 11, 73 S.Ct. at 533. In the present case, that necessity was high indeed. The plaintiff sought the information in question in order to establish the Bureau's *reason* for refusal to hire him—which was the gravamen of both the Title VII and First Amendment counts of the complaint, and an indispensable element of the Privacy Act count. This reason could be established only with great difficulty, if at all, from other sources.

■■■ The District Court satisfied itself that the reason for the failure to hire would impair the national security in what seems to us a fully adequate fashion: While it gave, as is appropriate, considerable deference to the views of the executive department as to what sort of matter would impair national security, *see Ellsberg v. Mitchell*, 709 F.2d at 58, it did not rest upon the conclusory statements contained in the public affidavit of Acting Attorney General Schmults, but also examined the sworn in camera affidavit of Edward J. O'Malley, Assistant Director in charge of the Bureau's Intelligence Division which specifically set forth the reason for the failure to hire.[2] It may be true, as we have earlier discussed, that the District Court's disposition relied upon its second mode of analysis, rather than its earlier merits ap-

proach that we choose to follow here, and used the affidavits as a basis for dismissing the suit directly, instead of denying the motion to compel disclosure. Nonetheless, it is clear that the judge was convinced of the validity of the state secrets claim—as we independently are, having examined the same documents, including the in camera affidavit.

■■■ Since the court could properly treat the defendants' motion as a Rule 56 motion; and since, by reason of the proper invocation of the state secrets privilege, rejection of the motion to compel disclosure did not wrongfully deprive plaintiff of an opportunity to submit responsive material; the question remaining is whether, on the evidence before the court, defendants were entitled to summary judgment.

### III

Under Federal Rule of Civil Procedure 56(c), a party moving for summary judgment must show that "there is no genuine issue as to any material fact." In making this determination, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion. However, the moving party is entitled to the benefit of any relevant presumptions, and if the established facts and relevant presumptions would have entitled him to a directed verdict at trial, he is entitled to a summary judgment under Rule 56." *United States v. General Motors Corp.*, 518 F.2d 420, 441–42 (D.C.Cir. 1975) (citations and internal quotations omitted). We will examine each of Molerio's claims to see if summary judgment should have been granted.

### A. *Title VII Claim*

■■■ Molerio claimed that his nonappointment was due to FBI discrimination against Hispanic, more specifically Cuban, applicants. He alleged that he was a mem-

---

2. We do not mean to suggest in camera inspection of an affidavit will always be sufficient to determine the validity of a claim of privilege for state secrets. In this case, we find that it was

so. The extent to which a district court may properly rely on affidavits and similar sources will vary from case to case. *See Ellsberg*, 709 F.2d at 58 & n. 36.

ber of an ethnic minority protected by federal employment discrimination laws, that he was qualified for the job of special agent for which he applied, and that he was turned down despite the fact that the Bureau hired more than 500 special agents in 1980, within a year of his application. He asserts on appeal that since these allegations track the four-part *McDonnell Douglas* test for establishing a prima facie case of Title VII discrimination, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), they were ipso facto sufficient to withstand the Bureau's motion to dismiss.

This mistakes the nature of the *McDonnell Douglas* test, which is merely meant to establish the ordinary order of production of evidence in a Title VII case. The test is irrelevant where what is at issue is the *adequacy* of the evidence to support a judgment. There, as the Supreme Court has said, *McDonnell Douglas* does not mean "that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). In the present case, the *McDonnell Douglas* prima facie showing was met with the assertion that Molerio was not qualified for the job because he could not obtain the necessary security clearance validly required pursuant to Executive Order No. 10,450, *reprinted in* 5 U.S.C. § 7311 note, Sec. 2 at 820 (1982), and 28 C.F.R. § 17.151 (1984). Molerio produced no evidence that this was a pretext for racial discrimination.

■■■■ Appellant points to the defendants' acknowledgement in responses to interrogatories and requests for admissions that in processing Molerio's request for top secret security clearance the Bureau considered among other things the fact that he had relatives in Cuba, and that it generally "would attach special weight to the fact that an applicant had relatives residing in any foreign country controlled by a government whose interests or policies are hostile to or inconsistent with those of the United States," Defendants' Response to Plaintiffs' Interrogatory No. 30. Neither the general policy nor its particular application to Cuba is any evidence of discrimination on the basis of race or national origin, since it would apply to any person, of any race or nationality, with relatives in the pertinent country. Molerio also asserts that the practice has a disparate impact on applicants of Cuban ancestry—since they are more likely to have relatives in Cuba—and therefore must be justified by a showing of business necessity. Of course the general practice in question has no more impact on Cubans than it does on East Germans or Iranians or North Vietnamese. In any case, 42 U.S.C. § 2000e–2(g) specifically acknowledges the general validity of national security clearance requirements, and we hold as a matter of law that the mere fact that such requirements impose special disabilities on the basis of connection with particular foreign countries is not alone evidence of discrimination.

In sum, the appellant produced no evidence that would support a finding of unlawful discrimination, and the summary judgment on that count of the complaint was proper.

### B. *Due Process Claim*

■■■ Molerio asserts that the Bureau's conduct violated that provision of the Fifth Amendment to the Constitution which states that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." He has not asserted any deprivation of *property,* since ordinarily there is of course no "legitimate claim of entitlement," *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), to be appointed to a particular federal job. *MacFarlane v. Grasso,* 696 F.2d 217, 221–22 (2d Cir.1982). He does claim, however, a deprivation of liberty under the principle of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), that such a deprivation is produced by the government's (1) "stigmatizing" an individual, in conjunction with (2) depriving him of some

other interest recognized and protected by law. It is clear that the first requirement has not been met.

■ Assuming, though it is doubtful, that the government's confidential and unpublished denial of security clearance, even for a specified defamatory reason, would be sufficiently disseminated to constitute the sort of "stigmatizing" that the *Paul v. Davis* line of cases has in mind,[3] *see Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the present case lacks an even more critical element: defamatory content. To receive a "top secret" clearance is assuredly a badge of loyalty; but to be denied it on unspecified grounds in no way implies disloyalty or any other repugnant characteristic—as is shown by the evidence in this case that the mere fact that one has relatives in a hostile country may be considered a basis for denial. The appellant here of course did not establish the specific grounds for denial—and even the only two grounds which he introduced any evidence to *suspect* (the fact that he had relatives in Cuba and the supposed fact that his father held certain political beliefs) are in no way defamatory of Molerio. We may also note, though it is not essential to our holding, that the only evidence in the record regarding the effect of the Bureau's decision disproves rather than establishes any stigmatizing effect: In April 1982, after the Bureau supposedly acted to damage Molerio's reputation, Molerio was reassigned from a GS–11 position with no possibility for promotion to a GS–12 position with potential for promotion to GS–13. Declaration of John W. Cummings (June 20, 1983).

There is simply no evidence on which a finding of deprivation of liberty without due process could be made.

## C. *First Amendment Claim*

We have been able to dispose of the first two claims on standard summary-judgment principles, without getting into the difficult issue of the effect of the state secrets privilege upon the subsequent trial of this case, after its use (discussed in Part II above) to preclude further discovery. We find it impossible to avoid that issue with respect to the third claim—at least if we do not wish to pronounce upon novel constitutional issues.

■ Molerio alleged that the Bureau's refusal to hire him violated the First Amendment because it was "based at least in part on the political activities and beliefs of his father." Brief for Appellant at 22.[4] Assuming without reaching the issue that adversely affecting Molerio on the basis of his father's lawful political activities gives Molerio standing to assert a First Amendment violation, it is impossible to say that there was no undisputed issue of material fact on this point. Appellant produced am-

3. *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 966 n. 24 (D.C.Cir. 1980), held that the debarment of a contractor for lack of integrity was sufficiently disseminated to meet the "stigma" requirement because it "had already been communicated through Government channels and would undoubtedly have been recommunicated every time ODDPI bid on a subsequent contract." *See also Larry v. Lawler,* 605 F.2d 954, 958 (7th Cir.1978) (results of standard background investigation to determine suitability for federal service disseminated "throughout the entire federal government"). It is not clear that the denial of a top secret security clearance, much less the specific reason for such denial, receives such wide circulation.

4. In his principal brief, appellant appears to complain of the Bureau's use of his father's alleged political activities, his filial relationship being the basis of its imputing those political activities to him, thus giving him a claim of standing to challenge what is primarily a deterrent upon the father's political rights. In his reply brief, however, appellant seems to assert that disadvantaging him on the basis of *any* characteristic of his father—whether political activities or criminal activities—infringes his First Amendment rights of association. Reply Brief for Appellant at 10. He cites no authority for such a proposition and we reject it. Even assuming that freedom of association rights are somehow implicated by considering *any* information regarding Molerio's father, national security is assuredly a sufficiently compelling governmental need that that alone—without the further specification that the father's exercise of rights of political speech and association were involved—would not make out a First Amendment case.

ple evidence from the Bureau's records and admissions that his father's participation in the United States Socialist Workers Party ("SWP") was a highly significant element in the security clearance investigation. The defendants admitted that the recalling of Molerio for a second background interview was prompted by "something in New York having to do with his family," *see* Complaint ¶ 14, Answer ¶¶ 14–15, and, more specifically, had as its purpose "to obtain Mr. Molerio's comments regarding his father's background," Defendants' Response to Plaintiff's Interrogatory No. 8 (Oct. 29, 1982). They likewise admitted that in making the decision not to hire Molerio they considered whether his father's political activities affected his suitability for government employment, Defendants' Response to Plaintiff's First Request for Admissions No. 29(a) & (d) (Oct. 29, 1982). An internal communication within the New York Field Office, relying on information gained by canvassing "New York assets familiar with Cuban matters," Report of Charles W. Butler, New York Field Office (Nov. 4, 1980), J.A. 84, stated:

> Background investigation has disclosed that applicant's father DAGOBERTO MOLERIO, is the head of the Socialist Workers Party in the NY area and as such applicant's employment can be viewed as a possible security risk.

Memorandum from Special Agent Hector Jose Berrios to Special Agent in Charge—New York (Nov. 6, 1980), J.A. 50. The Bureau did not pursue this lead for fear that the attention caused by an investigation would adversely affect the Bureau's position in pending litigation with the SWP. Report of Charles W. Butler, New York Field Office (Nov. 10, 1980), J.A. 89. To be sure, the public affidavit of the Bureau's Assistant Director for Intelligence stated that "[r]eported information about Mr. Molerio and the SWP did not influence the decision not to hire Daniel Molerio." Second Declaration of Edward J. O'Malley at ¶ 3 (June 20, 1983). But that speaks only to the SWP, and not other political activities—and in any event would not have to be believed by the trier of fact. We think

appellant had made a circumstantial case permitting the inference that his father's political activities were a " 'substantial factor'—or, to put it in other words, . . . a 'motivating factor' " in the failure to hire. *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (footnote omitted).

■ It seems to us, however, that the effect of our determination with regard to the state secrets privilege is to prevent this issue from proceeding. As noted earlier, we honored the invocation of that privilege because we satisfied ourselves that the in camera affidavit set forth the genuine reason for denial of employment, and that that reason could not be disclosed without risking impairment of the national security. As a result of that necessary process, the court knows that the reason Daniel Molerio was not hired had nothing to do with Dagoberto Molerio's assertion of First Amendment rights. Although there may be enough circumstantial evidence to permit a jury to come to that erroneous conclusion, it would be a mockery of justice for the court—knowing the erroneousness—to participate in that exercise. This is not a case like *Ellsberg v. Mitchell*, in which the court's consideration of the state secrets privilege did not ipso facto disclose to the court the validity of the defense—so that the latter could (at least in the special circumstances of that case) be left to be resolved by subsequent in camera proceedings. Here, by contrast, we know that further activity in this case would involve an attempt, however well intentioned, to convince the jury of a falsehood.

Since as a necessary consequence of our in camera consideration of the state secrets privilege we have satisfied ourselves as to the reason for the Bureau's failure to hire Molerio; and since that reason does not implicate any First Amendment concerns; this count of the complaint was properly dismissed.

### D. *Privacy Act Claim*

■ In the final count of his complaint, Molerio made various claims for relief un-

der the Freedom of Information Act and the Privacy Act. The only one preserved on this appeal rests upon that provision of the Privacy Act that provides remedies for persons harmed by an agency's intentional or willful failure to maintain accurate files, 5 U.S.C. § 552a(g)(1)(C) & (4). Molerio has arguably produced evidence sufficient to go to a factfinder on the point that the Bureau's files were intentionally or willfully inaccurate—to-wit, his father's affidavit that he has never been associated with the SWP. This cause of action under the Privacy Act requires, however, not merely an intentional or willful failure to maintain accurate records, but also "actual damages sustained" as a result of such failure. 5 U.S.C. § 552a(g)(4)(A). We have held this to mean that the violation of the Act must *cause* the damages complained of. *Albright v. United States*, 732 F.2d 181, 186 (D.C.Cir.1984). In the present case, that means Molerio had to establish that the reason he was not hired was the erroneous report regarding his father's association with the SWP. As we reasoned above with regard to the First Amendment issue, our consideration of the in camera affidavit in connection with the state secrets privilege prevents that from being proved. Since we know it to be false, it is no longer an issue that can be litigated before us. Summary judgment on this count was therefore properly granted as well.

\*       \*       \*       \*       \*       \*

We emphasize that in affirming the rejection of Mr. Molerio's claims we in no way impugn his loyalty to the United States. Indeed, it is one of the premises of our judgment that no hint of disloyalty attaches. Nor have we rejected the validity of the assertion that the elder Molerio was not, contrary to what the Bureau at one time believed, a leader in or even a member of the SWP. All we hold is that, because of the effects of the government's valid assertion of the state secrets privilege, no claim for the injunctive and monetary relief Mr. Molerio seeks has been established.

For the reasons described, the decision of the District Court is

*Affirmed.*